1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   MATTHEW JOSEPH METCALF,

11                  Plaintiff,                    CASE NO. 2:20-cv-01876-RAJ-DWC

12          v.                                    REPORT AND RECOMMENDATION

13   STEPHEN SINCLAIR, *et al.*,                  Noting Date: **March 11, 2022**

14                  Defendants.

15

16          Plaintiff filed this case under 42 U.S.C. § 1983. Dkt. 6. Before the Court is Defendants'

17   motion for summary judgment. Dkt. 39. As discussed below, this motion should be granted.

18                              **COMPLAINT'S ALLEGATIONS**

19          Plaintiff is a convicted and sentenced state prisoner who, in March of 2020, was housed

20   at Monroe Correctional Complex ("MCC"). *See* Dkt. 6 at 5; Dkt. 6-1 at 2. Plaintiff alleges that,

21   on March 16, 2020, he "complained of stomach pain to medical." Dkt. 6 at 5. Thereafter,

22   plaintiff continues, he "was placed in the Punitive isolation unit at TRU E unit, with prisoners

23   suffering with COVID 19." *Id.* Allegedly, in E-Unit, plaintiff was exposed to the following

24   conditions:

REPORT AND RECOMMENDATION - 1

1  Cells were unclean; I was denied personal hygiene; there was only cold blackish
   water; No showers, clean clothes, No heat, No tv, radio . . . , [or] a Bible or other
2  religious materials or any reading material . . . to exercise his mind. Plaintiff was
   not permitted out of his cell, not even for exercise. His cell was to[o] small . . . to
3  exercise . . . .

4  *Id.* at 5–6.

5        Plaintiff alleges that he was housed in the E unit from March 16, 2020 to April 2, 2020.

6  *Id.* Plaintiff further alleges that, at some point, he "climbed up on the upper bunk . . . to distance

7  himself from the" "cold radiating from the cement floors." *Id.* at 11. Yet, according to plaintiff,

8  the "guards" gave him a Negative Behavior Report ("BOE") "for being in the wrong bed." *Id.*

9        Plaintiff alleges that he "had a right to practice his religion while being kept in 'E' unit."

10 *Id.* at 16. But Plaintiff adds that "Chaplain Fisher refused to provide [him] with a Bible so that he

11 could practice[] his religion by studying scripture." *Id.*

12       Plaintiff alleges that, while in E-Unit, he "filed several grievances that were either

13 throw[n] away or lost." *Id.* at 6. Yet Plaintiff alleges that an emergency grievance filed on March

14 17, 2020 was discovered after he left E-Unit. *See id.*; Dkt. 6-1 at 2. At some point, according to

15 plaintiff, "staff" told him that "they did not want to see any more grievances being filed about the

16 units['] condition." Dkt. 6 at 17. Plaintiff adds that "his grievances were thrown away and or not

17 properly processed . . . to prevent [him] from exposing the conditions of the 'E' unit." *Id.* at 18.

18       Plaintiff alleges that E-Unit's conditions were cruel and unusual in violation of the Eighth

19 Amendment. *Id.* at 6. Plaintiff further alleges that E-Unit's conditions amounted to "Punitive

20 Isolation" that violated due process. *Id.* at 12–14. Additionally, plaintiff alleges that E-Unit's

21 conditions violated equal protection because they were "substantially harsher than other

22 similar[ly] situated Medical isolations." *Id.* at 15.

23       Plaintiff alleges various First Amendment violations based on separate theories. First,

24 Plaintiff contends that his right to religious freedom was violated because "Bibles and other

religious items [were not allowed] into 'E-unit.'" *Id.* at 16. Second, plaintiff alleges that, after he tried to expose E-Unit's conditions, he experienced retaliation because his grievances were "thrown away and or not properly processed" and he received a negative BOE. *Id.* at 18. Plaintiff also alleges a First Amendment violation based on the denial of his right of access to the courts. *Id.* at 17. In support, Plaintiff alleges that he could not access the court "without . . . first being able to exhaust the grievance process/remedy." *Id.*

Moreover, Plaintiff alleges a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") based on the allegations underlying his First Amendment free exercise claim. *Id.* at 20. Plaintiff alleges a violation of Article 1, § 22 of the Washington State Constitution based on the same allegations. *Id.* at 21.

Plaintiff does not expressly allege the relief he seeks. *See generally* Dkt. 6. However, plaintiff alleges that these purported violations of federal and state law caused him depression, anxiety, stress, sleeplessness, and physical pain that aggravated his stomach pain. *See, e.g.*, Dkt. 6 at 6, 13, 21. Therefore, liberally construed, Plaintiff's complaint seeks damages. *Cf. Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002) (suggesting that a complaint may be "consistent with a claim" for damages even if they are not "expressly requested").

Plaintiff sues the following Defendants in their individual and official capacities: (1) Stephen Sinclair, former Secretary of the Washington Department of Corrections ("DOC"); (2) HQ Incident Commander; (3) the DOC; (4) Scott Russell, DOC Deputy Director; (5) MCC/WSR;[1] (6) Mike Obenland, former WSR Superintendent; (7) Eric Jackson, MCC

---

[1] "WSR" stands for "Washington State Reformatory." Dkt. 6 at 2.

1  Superintendent; (8) Michelle Wood, MCC Associate Superintendent; (9) Captain Frantz; and

2  (10) Chaplain Fischer.[2] *See id.* at 1, 3–4, 7.

3                              **PROCEDURAL BACKGROUND**

4          Defendants answered. Dkt. 16. The Court issued a scheduling order. Dkt. 17. On January

5  5, 2022, Defendants moved for summary judgment. Dkt. 39. In support, Defendants filed the

6  declarations of Defendants Russell, Jackson, and Fischer. Dkts. 40–42.

7          On January 20, 2022, attorney Darryl Parker entered an appearance on behalf of Plaintiff.

8  Dkt. 44. On January 31, 2022, through Mr. Parker, Plaintiff filed a response. Dkt. 45. Plaintiff

9  submitted his own affidavit to support his response. Dkt. 47. Mr. Parker also submitted an

10 affidavit, although it states counsel's opinion on the case's merits and is largely irrelevant to the

11 issues before the Court. Dkt. 46. Defendants replied. Dkt. 48.

12                           **SUMMARY JUDGMENT STANDARD**

13         Summary judgment is only proper where the materials in the record show that there is no

14 genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

15 *See* Fed. R. Civ. P. 56(a), (c). "A 'material' fact is one that is relevant to an element of a claim or

16 defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac.*

17 *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted). A disputed

18 material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict

19 for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where

20 the record taken as a whole could not lead a rational trier of fact to find for the non-moving

21

22

23 ─────────────────────

24         [2] Plaintiff erroneously spelled Defendant Fischer's surname as "Fisher" in the complaint.

1  party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

2  U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

3          When reviewing a motion for summary judgment, the court must believe the nonmoving

4  party's evidence and draw all reasonable inferences in his or her favor. *T.W. Elec. Serv.*, 809

5  F.2d at 630–31. Also, the court must avoid weighing conflicting evidence or making credibility

6  determinations. *Id.* at 631.

7          "A summary judgment motion cannot be defeated by relying solely on conclusory

8  allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

9  (citation omitted). "Likewise, mere . . . speculation do[es] not create a factual dispute for

10  purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir.

11  1996) (citation omitted). Moreover, "[a] mere scintilla of evidence supporting the non-moving

12  party's position is insufficient[ to survive summary judgment]." *Rivera v. Philip Morris, Inc.*,

13  395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).

14                              **THE PARTIES' EVIDENCE**

15  **I.      Defendants' Evidence**

16          Defendants filed the declarations of Defendants Russell, Jackson, and Fisher. Dkts. 40–

17  42. Defendant Fischer's declaration is under penalty of perjury. Dkt. 42 at 1. Defendant Russell's

18  and Jackson's declarations are not sworn to under penalty of perjury. Dkt. 40 at 5; Dkt. 41 at 5.

19  However, Plaintiff, who is represented by counsel, did not object to the evidence. As Plaintiff

20  has not objected to the validity of these two declarations, the Court will consider them as

21  evidence.

22

23

24

A.    Defendant Jackson

Defendant Jackson declares as follows:

Defendant Jackson is the Superintendent at MCC. Dkt. 41 ¶ 2. MCC consists of several separate incarcerated individual living units, including the MCC Twin Rivers Unit ("TRU"). *Id.* ¶ 4. Defendant Jackson's duties as Superintendent included planning, organizing, and directing all operations of TRU. *Id.* ¶ 2. In addition to his duties as Superintendent, Defendant Jackson served as Incident Commander for MCC in March 2020. *Id.* ¶ 3. "[A]s part of COVID-19 mitigation response, the incident commanders received direction from HQ Unified Command and insured those protocols [were] being implemented locally, while managing any additional issues that came up locally." *Id.*

"With the onset of COVID-19 in March 2020, there became an urgent need to separate and isolate individuals suspected or confirmed to have COVID-19 and a means to isolate them from the rest of the population." *Id.* ¶ 6. "This was important to mitigate any spread of the virus to the rest of the prison population as well as the staff." *Id.* Therefore, Defendant Jackson "authorized opening E-Unit at [TRU] as a predetermined place . . . to house those individuals." *Id.* ¶ 7. Because E-Unit "had not been an active, operating housing unit for some time, maintenance and custody staff were responsible [for] preparing the [it] for inmate use." *Id.* Before the E-Unit opened, maintenance staff informed Defendant Jackson that it was operational. *Id.*

After E-Unit "began to receive incarcerated individuals who required COVID-19 isolation or quarantine, maintenance issues arose." *Id.* ¶ 8. Once Defendant Jackson became aware of those issues, "maintenance staff were brought in immediately to provide any repairs," with those "repairs occurring quickly." *See id.* Also, accommodations were made until the

1  maintenance issues could be resolved. *Id.* For instance, when "the heat went out, incarcerated

2  individuals were provided with extra blankets until the heat could be repaired." *Id.* "When the

3  water coming out of the faucets required a system 'flush' in order to remove discoloration due to

4  no recent use of the plumbing prior to opening [E-Unit], incarcerated individuals were provided

5  clean/potable water from alternate sources." *Id.*

6        Prisoners in E-Unit were not provided shower use when it first opened. *Id.* ¶ 9. This was

7  because protocols required that isolated individuals not receive "the opportunity to shower for a

8  specific amount of time to reduce the spread of [] COVID-19." *See id.* Instead, prisoners

9  received "washbasins and toiletry items to maintain personal hygiene." *Id.* Once medical staff

10  informed Defendant Jackson that showering was safe, starting March 28, 2020, showers were

11  offered to prisoners in E-Unit on a rotating basis." *See id.*

12        Prisoners in E-Unit "were also restricted in out of cell recreation time as there was

13  concern about the spread of [] COVID-19." *Id.* ¶ 11. "All efforts were made to provide

14  [prisoners] with playing cards, reading material, radios[,] and other items at no cost as they

15  became available." *Id.*

16        Medical staff determined which prisoners were to be placed in E-Unit "due to the need

17  for isolation or quarantine." *Id.* ¶ 14. "Medical and mental health staff also were responsible for

18  performing regularly scheduled visits to [E-Unit] to attend to any necessary medical or mental

19  health needs of the [prisoners]." *Id.*

REPORT AND RECOMMENDATION - 7

1         B.    <u>Defendant Russell</u>

2        Defendant Russell declares as follows:

3        Defendant Russell is the Deputy Director of the DOC's Health Services Division. Dkt. 40

4    ¶ 2. Defendant Russell has "been closely involved in the [DOC's] response to the COVID-19

5    pandemic." *Id.*

6        In February 2020, DOC opened its Emergency Operations Center, partly to "oversee the

7    [DOC's] own response to the pandemic." *Id.* ¶ 6. "In consultation with [DOC] headquarters staff

8    . . . , prison facilities made determinations on best practices to house inmates who required

9    quarantine or isolation status to avoid the spread of the virus." *Id.* ¶ 11. These efforts were

10   "especially crucial at the early onset of the pandemic in March 2020." *Id.* "The urgent need to

11   remove inmates from their housing units that could require quarantine or isolation status was

12   paramount to mitigate any spread of [COVID-19] to the rest of the prison and staff population."

13   *Id.* "Because at that time most prisons did not have a lot of 'active' empty housing units, prison

14   facilities were finding ways to create space that could house inmates on quarantine or isolation

15   status." *Id.* "This included re-opening housing units that had not been operational for some

16   time." *Id.*

17       In March 2020, MCC reopened E-Unit for prisoners who "were required to be

18   quarantined." *Id.* ¶ 12. "Nursing staff were present in [E-Unit] and inmates who requested

19   additional medical [care] had the ability to submit medical kites." *Id.* "A provider (Nurse

20   Practitioner, Physician's Assistant or M.D.) rotated in [E-Unit] two to three days a week." *Id.*

21

22

23

24

1      C.    <u>Defendant Fischer</u>

2      Defendant declares as follows:

3      Defendant Fischer worked as MCC's chaplain at all relevant times. *See* Dkt. 42 ¶ 1.

4  When E-Unit was opened to house COVID-19 patients, not a lot "was . . . known about how the

5  virus was spread." *Id.* ¶ 3. Therefore, DOC medical staff "were responsible for making

6  determinations based on inmate health and safety concerns related to particular housing needs."

7  *Id.* "Staff were instructed that paper needed to be destroyed to prevent spreading the virus to

8  others." *Id.* "If a bible was provided to an individual in isolation, the bible would have to be

9  destroyed after the individual left isolation." *Id.*

10      "Due to the limited number available, [Defendant Fischer] did not feel destroying a bible

11  after a few weeks of use would be a wise stewardship of donated bibles." *Id.* ¶ 4. Therefore,

12  instead of giving prisoners in E-Unit bibles, Defendant Fischer "provided other religious

13  materials that could be destroyed after the individual left isolation." *Id.* "This included pamphlets

14  or photocopies of religious readings." *Id.*

15      When Plaintiff arrived at E-Unit, he requested a bible. *Id.* ¶ 5. Defendant Fischer did not

16  give him one because it "would have been destroyed after he left isolation." *Id.* Instead,

17  Defendant Fischer provided Plaintiff with a copy of "the Gospel of John." *Id.*; Dkt. 42-2 at 39.

18  Defendant Fischer considering this "an adequate amount of religious material to sustain any

19  Christian spiritually during the 17 days [Plaintiff] was in [i]solation." Dkt. 42 ¶ 5.

20

21

22

23

24

1

## II.    Plaintiff's Evidence

2

A.    <u>Plaintiff's Declaration</u>

3

Plaintiff declares as follows:

4

On March 16, 2020, Plaintiff informed DOC medical staff that he was experiencing

5   abdominal pain. Dkt. 47 ¶ 3. The following morning, Physicians Assistant Phu Ngo and Nurse

6   Darren, both nondefendants, took Plaintiff's temperature and blood pressure, which were normal.

7   *Id.* ¶ 4. Shortly thereafter, an unnamed correctional officer told plaintiff that he would be placed

8   in E-Unit.[3] *Id.* ¶ 5. However, Plaintiff was not sick and was not tested for COVID-19 before this

9   placement. *Id.*

10

Upon entering E-Unit, Plaintiff "was forced to strip out of all of [his] clothes and []

11   ordered to put on clothes that were old, smelly[,] and appeared to have mold on them." *Id.* ¶ 6.

12   Plaintiff "was then taken to a cell that was cold and disgusting." *Id.* ¶ 7. "It had mold[] [and] the

13   temperature in the cell was 40 degrees." *Id.* "There was pink ins[u]lation material that appeared

14   to be asbestos." *Id.* "There was no hot water at all, and the cold-water faucet was running black."

15   *Id.* "The toilet . . . was covered in mold." *Id.* "There was an old lumpy mattress on the floor, and

16   [Plaintiff was] given blankets to put on them." *Id.* "There were no showers and after a few days

17   [Plaintiff was] given a cold bucket of water if [he] want[ed] to wash [himself]." *Id.* ¶ 8. Two

18   weeks went by before Plaintiff could shower, which was "just once." *Id.*

19

20

21

22

23

24

[3] Plaintiff refers to E-Unit as a "Punitive Isolation Unit (PIU)." Dkt. 47 ¶ 5. However, there is no evidence that any DOC officials referred to E-Unit as PIU. Rather, this designation reflects Plaintiff's argument that E-Unit was punitive. Therefore, the Court refers to E-Unit by its regular name, not Plaintiff's designation.

1    On the fourteenth day in E-Unit, "staff managed to get the temperature above fifty

2  degrees, but it was still bone-chillingly cold." *Id.* ¶ 9. "Because of the cold and [his] abdominal

3  pain, [Plaintiff] was hurting and physically suffering for 17 days." *Id.*

4    Plaintiff was not tested for COVID-19 during his 17-day isolation. *Id.* ¶ 10. Nor was he

5  "permitted time outside of [his] cell, as inmates in solitary confinement are normally allowed to

6  have." *Id.* ¶ 11. Furthermore, "DOC staff did not provide [Plaintiff] with any medical treatment

7  for [his] pain [or] allow [him] basic human necessities to maintain [his] personal hygiene

8  throughout [his] time in isolation." *Id.* "During this time, [Plaintiff] filed an emergency grievance

9  regarding the lack of medical care and necessities . . . and never received a response." *Id.*

10    On April 2, 2020, Plaintiff was released from isolation." *Id.* ¶ 12. He filed multiple

11  grievances about his experiences in E-Unit and "each grievance was either thrown away or lost

12  by DOC employees and staff." *Id.* Plaintiff "filed a grievance with regards to [his] lost

13  grievances and received a response stating that [he] had not filed any other grievances in the

14  past." *Id.*

15    "Because of [his] prolonged isolation, [Plaintiff] suffered from anxiety, depression,

16  mental distress, and humiliation." *Id.* ¶ 13. Plaintiff also "suffered from a loss of sleep and severe

17  discomfort due to the anxiety of being housed with other individuals who had tested positive for"

18  COVID-19. *Id.*

19    "DOC employees possessed prior knowledge of the inhumane conditions within [E-Unit]

20  and ultimately chose to move [Plaintiff there] despite [his] lack of a positive" COVID-19 test. *Id.*

21  ¶ 14.[4]

22

23  ───────────────

24    [4] The Court does not consider the allegations in Plaintiff's complaint as evidence on
   summary judgment because Plaintiff has submitted a declaration under penalty of perjury and the

1          B.      Plaintiff's Grievances

2          On March 17, 2020, Plaintiff filed an emergency grievance (Log ID number 20700107)

3   complaining about the conditions in E-Unit, including cold temperatures and no hot water. Dkt.

4   6-1 at 2. A note on the grievance states that this grievance "was discovered" on April 1, 2020 and

5   "picked up" on April 3, 2020. *Id.* On April 9, 2020, nondefendant B. Blair, a grievance

6   coordinator, responded to this grievance. *Id.* Coordinator Blair stated that Plaintiff grieved "2

7   complains on [the] same issue" and thus instructed him to rewrite his grievance into "1

8   compla[i]nt" and return in by April 16, 2020. *Id.*

9          On May 15, 2020, Plaintiff filed an appeal of Log ID number 20700107. *Id.* at 4. On June

10  26, 2020, Defendant Jackson responded to Plaintiff's appeal. *Id.* Defendant Jackson stated that

11  "[d]ecisions regarding the operation of [E-Unit] for COVID 19 were made by the facility

12  Captain, facility Superintendent, local Incident Commander[,] and the HQ Incident

13  Commander." *Id.* Further, Defendant Jackson stated that "Captain Frantz went to [E-Unit] daily

14  to speak to [prisoners] and staff in an attempt to address and resolve issues." *Id.* Additionally,

15  Defendant Jackson stated:

16          Initially, the heat and water temperature were not consistent and were colder than
            average. Items allowed in were restricted, to include religious material. Items
17          were not allowed to leave the unit and were destroyed, this included commissary
            items and some personal property. Showers were delayed, and so was clothing
18          exchange.

19  *Id.*

20

21

22

23  ─────────────────────────

24  Court is considering that evidence. Plaintiff, whom counsel represents, has not asked the Court to
    consider the allegations in his unsworn complaint as evidence for summary judgment purposes.

1   Defendant Jackson also stated that Plaintiff's complaint had merit, "as stated in the Level

2   I."[5] Defendant Jackson added that most of the changes made to address "these issues" "occurred

3   after [his] release" from E-Unit. *Id.*

4   On July 2, 2020, Plaintiff filed an appeal to the third level. *Id.* at 6. On August 4, 2020,

5   DOC Administrator Tim Thrasher, a nondefendant, issued a response noting that Plaintiff's

6   grievance had merit and stating that he agreed with the Level I and II responses.

7   **LEGAL ANALYSIS**

8   **I.      Defendants DOC and MCC/WSR**

9   Plaintiff sues DOC and MCC/WSR. *See supra* pp. 3–4. However, states and state

10  agencies are not "persons" under § 1983. *See Pittman v. Oregon, Emp. Dep't*, 509 F.3d 1065,

11  1071–72 (9th Cir. 2007) (citations omitted). Therefore, § 1983 actions do not lie against states or

12  their agencies. *See id.*; *see also Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 69–70 (1997);

13  *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004) (citing *Will v. Mich. Dep't of State*

14  *Police*, 491 U.S. 58, 70 (1989)). Accordingly, summary judgment should be granted to

15  Defendants on Plaintiff's claims against Defendants DOC and MCC/WSR.

16  **II.     Official-Capacity Claims**

17  Plaintiff sues all Defendants in their official capacities and seeks only damages. *See*

18  *supra* pp. 3–4. "States, state agencies, and state officers sued in their official capacities are

19  absolutely immune from damage actions in federal court pursuant to the Eleventh Amendment,

20  unless the state consents to suit." *Lojas v. Washington*, No. CV-07-0140-JLQ, 2008 WL

21  1837337, at *7 (E.D. Wash. Apr. 22, 2008). And the state of Washington has not waived this

22

23  _____

24  [5] Plaintiff's Level I response, assuming one exists, is not in the record.

"immunity in the federal courts." *Hanson v. Washington State Patrol*, No. 13-CV-0166-TOR, 2013 WL 4518594, at *2 (E.D. Wash. Aug. 26, 2013) (citations omitted). Therefore, the Eleventh Amendment bars Plaintiff's official-capacity claims. Accordingly, summary judgment should be granted to Defendants on these claims.

### III.    Personal Involvement and Causation

"Section 1983 has a causation requirement, with liability extending to those state officials who subject, or cause to be subjected an individual to a deprivation of his federal rights." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (alterations adopted) (internal quotation marks omitted). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Id.* (citing *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). "Moreover, personal participation is not the only predicate for section 1983 liability." *Id.* (citing *Duffy*, 588 F.2d at 743). "Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable." *Id.* (quoting *Duffy*, 588 F.2d at 743). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (citing *Duffy*, 588 F.2d at 743). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (citations omitted).

1    Here, no evidence suggests that Defendant Sinclair, Obenland, or Wood personally

2    participated in the alleged constitutional violations or otherwise caused them. True, Defendant

3    Jackson states in his response to Plaintiff's appeal that "[d]ecisions regarding the operation of [E-

4    Unit] for COVID 19 were made by the facility Captain, facility Superintendent, local Incident

5    Commander[,] and the HQ Incident Commander." Dkt. 6-1 at 4. Potentially, this statement could

6    support an inference that these unnamed DOC officials were involved in the operation of E-Unit

7    and, hence, involved in the alleged constitutional violations. However, no evidence suggests that,

8    in mentioning these unnamed officials, Defendant Jackson was referring to Defendant Sinclair,

9    Obenland, or Wood. Rather, the only evidence is that Defendant Frantz is the "facility Captain"

10   and that Defendant Jackson himself is the "local Incident Commander." *See id.*; Dkt. 41 ¶ 3.

11   Furthermore, there is no evidence that any specifically named Defendant is the "HQ Incident

12   Commander." *See* Dkt. 41 ¶ 3. Indeed, Plaintiff sues the "HQ Incident Commander" as a doe

13   defendant. Dkt. 6 at 1. Therefore, Defendant Jackson's response to Plaintiff's appeal does not

14   support a reasonable inference that Defendants Sinclair, Obenland, and Wood were personally or

15   causally involved in the alleged constitutional violations.

16   Similarly, Defendants contend in their motion for summary judgment that Plaintiff has

17   failed to show that Defendants Sinclair, Obenland, and Wood participated in the alleged

18   constitutional violations. *See* Dkt. 39 at 12–13. In his response, Plaintiff did not meaningfully

19   dispute Defendants' assertion. *See* Dkt. 45 at 6. This observation strengthens the conclusion that

20   no evidence supports a reasonable finding that Defendants Sinclair, Obenland, and Wood were

21   personally or causally involved in the alleged violations of federal law.

22

23

24

1    For these reasons, the Court should grant summary judgment to Defendants on Plaintiff's

2    individual-capacity claims against Defendants Sinclair, Obenland, and Wood.[6]

3    **IV.    Eighth Amendment**

4    Plaintiff alleges that E-Unit's conditions were cruel and unusual in violation of the Eighth

5    Amendment. Dkt. 6 at 6.

6    The Eighth Amendment protects prisoners from inhumane methods of punishment and

7    inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir.

8    2006). Where the plaintiff challenges his conditions of confinement, he must make two

9    showings. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "First, the plaintiff must make an

10   'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth

11   Amendment violation." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Second, the

12   plaintiff must make a 'subjective' showing that the prison official acted 'with a sufficiently

13   culpable state of mind.'" *Id.* (quoting *Wilson*, 501 U.S. at 298).

14   Objectively, "only those deprivations denying the minimal civilized measure of life's

15   necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*

16   *v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). "This requires the inmate to demonstrate

17   'conditions posing a substantial risk of serious harm' that present an 'excessive risk to his health

18   or safety.'" *Norbert v. City & Cty. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (alteration

19   adopted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Prison officials have a duty

20

21   _____

22   [6] Defendant Wood participated in the investigation of Plaintiff's grievance. Dkt. 6-1 at 4.
     However, this investigation occurred after Plaintiff left E-Unit. Furthermore, prisoners do not

23   have a due process right to a "specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d
     850, 860 (9th Cir. 2003) (citation omitted). Therefore, Plaintiff's allegations against Defendant

24   Wood present no genuine issues for trial.

1  to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care,

2  and personal safety. *Johnson*, 217 F.3d at 731 (citations omitted); *see also Norbert*, 10 F.4th at

3  928–29 ("We have recognized that exercise is one of the basic human necessities protected by

4  the Eighth Amendment." (citation and internal quotation marks omitted)). "The circumstances,

5  nature, and duration of a deprivation of these necessities must be considered in determining

6  whether a constitutional violation has occurred." *Johnson*, 217 F.3d at 731. "Some conditions of

7  confinement may establish an Eighth Amendment violation 'in combination' when each would

8  not do so alone, but only when they have a mutually enforcing effect that produces the

9  deprivation of a single, identifiable human need such as food, warmth, or exercise—for example,

10  a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at

11  304 (emphasis omitted).

12          Subjectively, "an Eighth Amendment violation requires a showing that the subjective

13  state of mind of the prison officials was culpable." *Johnson*, 217 F.3d at 733 (citing *Wilson*, 501

14  U.S. at 298–99). For this to be so, the official must have acted with "deliberate indifference." *Id.*

15  (citing *Wilson*, 501 U.S. at 303). "The deliberate indifference standard requires the plaintiff to

16  prove that 'the official knows of and disregards an excessive risk to inmate health or safety . . . .

17  '" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be

18  aware of facts from which the inference could be drawn that a substantial risk of serious harm

19  exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Whether an official

20  possessed such knowledge 'is a question of fact subject to demonstration in the usual ways,

21  including inference from circumstantial evidence.'" *Johnson*, 217 F.3d at 734 (quoting *Farmer*,

22  511 at 842).

23

24

1    "In addition, prison officials who actually knew of a substantial risk to inmate health or

2    safety may be found free from liability if they responded reasonably to the risk, even if the harm

3    ultimately was not averted." *Farmer*, 511 U.S. at 844. "A prison official's duty under the Eighth

4    Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison

5    officials' unenviable task of keeping dangerous men in safe custody under humane conditions."

6    *Id.* at 844–45 (citations and internal quotation marks omitted).

7         Here, Plaintiff states that, for 17 days, he was housed in a moldy cell whose temperatures

8    were in the 40s and 50s. *Supra* p. 10. Furthermore, Plaintiff states that he was forced to wear

9    "old, smelly" clothes not allowed out of his cell to exercise the entire time he was in E-Unit. *See*

10   *supra* p. 10; Dkt. 6-1 at 6. Plaintiff also states that, because of the cold and his abdominal pain,

11   he "was hurting and physically suffering for 17 days." Dkt. 47 ¶ 9. The Court assumes *arguendo*

12   that, in combination, these conditions posed a substantial risk of serious harm to Plaintiff. *See*

13   *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) ("It is true that most successful Eighth

14   Amendment claims often involve allegations of cold in conjunction with other serious

15   problems." (citations omitted)); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)

16   ("Exercise has been determined to be one of the basic human necessities protected by the Eighth

17   Amendment.").[7]

18

19

20

---

21   [7] A reasonable juror could not conclude that Plaintiff was exposed to asbestos in E-Unit.
     He states, without further factual support, that there "was pink ins[u]lation material that
     *appeared* to be asbestos." Dkt. 47 ¶ 7 (emphasis added). Such "sweeping conclusory allegations"

22   are insufficient to create a genuine dispute of material fact. *See Cafasso, U.S. ex rel. v. Gen.
     Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citation omitted). Plaintiff's

23   allegations that he was exposed to mold in his cell, though no model of specificity, are more
     detailed than the isolated allegation that his cell had insulation that appeared to contain asbestos.

24   *See supra* p. 10.

1    The question, then, is whether a reasonable juror could conclude that any remaining

2    Defendant—Fischer, Russell, Jackson, Frantz, or HQ Incident Commander—was deliberately

3    indifferent to the risk these conditions posed.

4        Regarding Defendant Fischer, no reasonable juror could so conclude. There is no

5    evidence that Defendant Fischer, as MCC's Chaplain, knew about the conditions in E-Unit. The

6    fact that Defendant Fischer provided Plaintiff a copy of the Gospel of John does not, without

7    more, support a reasonable inference that he knew about the conditions in Plaintiff's cell. And,

8    even if Defendant Fischer knew about the conditions, there is no evidence that he was

9    "responsible for" addressing them. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992),

10   *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997)

11   (en banc). So summary judgment should be granted to Defendants on Plaintiff's Eighth

12   Amendment claim against Defendant Fischer.

13       Likewise, no reasonable juror could conclude that Defendant Russell was aware of E-

14   Unit's conditions. Defendant Russell declares that he was involved in the DOC's response to the

15   COVID-19 pandemic, including the implementation of a policy to isolate prisoners suspected of

16   having the virus. *See supra* p. 8. However, without more, this fact does not support a reasonable

17   inference that Defendant Russell was aware of the conditions at issue. Plaintiff's conclusory

18   allegation that "DOC employees possessed prior knowledge of the inhumane conditions within

19   the isolation unit and chose to move [him there]" fails to show otherwise. Dkt. 47 ¶ 14. Plaintiff

20   does not specify these individuals or explain on what factual basis they possessed such

21   knowledge. *See Cafasso*, 637 F.3d at 1061. In short, no facts support a reasonable inference that

22   Defendant Russell knew of E-Unit's subject conditions. So summary judgment should be granted

23   to Defendants on Plaintiff's Eighth Amendment claim against him.

24

1    Now the Court must address Defendants Jackson, Frantz, and HQ Incident Commander.

2    Drawing all reasonable inferences in Plaintiff's favor, the evidence supports a reasonable

3    inference that these Defendants knew of E-Unit's conditions. Defendant Jackson declares that he

4    opened E-Unit and became aware of the maintenance issues that arose there. Dkt. 41 ¶ 8.

5    Furthermore, in his response to Plaintiff's appeal, Defendant Jackson stated that "[d]ecisions

6    regarding the operation of [E-Unit] for COVID 19 were made by the [Captain Frantz],

7    [himself][,] and the HQ Incident Commander." *See* Dkt. 6-1 at 4. Because Defendant Jackson

8    was responding to Plaintiff's grievance about these conditions, this remark supports a reasonable

9    inference that these Defendants knew of the subject conditions. Indeed, Defendant Jackson states

10   that "Captain Frantz went to the unit daily to speak to incarcerated individuals and staff in an

11   attempt to address and resolve issues [i]n E unit." *Id.*

12   That a reasonable juror could conclude these Defendants knew of E-Unit's conditions

13   does not end the Eighth Amendment inquiry. As noted, "[t]he deliberate indifference standard

14   requires the plaintiff to prove that the official knows of and *disregards* an excessive risk to

15   inmate health or safety." *Johnson*, 217 F.3d at 733 (emphasis added) (citation and internal

16   quotation marks omitted). And, again, "prison officials who actually knew of a substantial risk to

17   inmate health or safety may be found free from liability if they responded reasonably to the risk,

18   even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

19   Here, no reasonable juror could conclude that the subject Defendants disregarded E-

20   Unit's conditions. For similar reasons, a reasonable juror could only conclude that they

21   reasonably responded to these conditions.

22   Regarding cold temperatures, Defendant Jackson contends that, when "the heat went out,

23   incarcerated individuals were provided with extra blankets until the heat could be repaired." Dkt.

24

1   41 ¶ 8. Plaintiff does not dispute this assertion and admits that he received "blankets." Dkt. 47 ¶

2   7. Therefore, a reasonable juror could only conclude that Plaintiff received extra blankets to cope

3   with his cell's cold temperatures. This measure reflects concern, not indifference, to this

4   condition. *Cf. Wilson*, 501 U.S. at 304 (suggesting that blankets are an appropriate response to

5   cold cell temperatures at night); *Johnson*, 217 F.3d at 732 (suggesting that blankets may provide

6   adequate projection from subfreezing temperatures). Likewise, Plaintiff admits that prison

7   officials were working to fix the lack of heat in E-Unit during his isolation. *See* Dkt. 6-1 at 2

8   (grievance stating that prison officials took the temperature in Plaintiff's cell one day after his

9   placement in E-Unit); Dkt. 47 ¶ 9 (Plaintiff's declaring that "staff managed to get the

10   temperature [higher]" after two weeks).

11       Regarding water access, Plaintiff declares that "[t]here was no hot water at all, and the

12   cold-water faucet was running black." Dkt. 47 ¶ 7. He further declares that "[t]here were no

13   showers and after a few days [he was] given a cold bucket of water if [he] want[ed] to wash

14   [himself]." *Id.* ¶ 8.

15       A reasonable juror could not conclude that Defendants disregarded these conditions.

16   Defendant Jackson declares that, "[w]hen the water coming out of the faucets required a system

17   'flush' in order to remove discoloration due to no recent use of the plumbing prior to opening [E-

18   Unit], incarcerated individuals were provided clean/potable water from alternate sources." Dkt.

19   47 ¶ 8. Plaintiff has not disputed that DOC officials flushed the faucets. Furthermore, he

20   basically concedes that he received clean water from alternate sources. *See* Dkt. 47 ¶ 8. Plaintiff

21   counters that the water was cold. But the mere fact that Plaintiff received clean yet cold water on

22   a temporary basis does not support a reasonable finding that Defendants disregarded his alleged

23   right to hot water. *See Hopkins v. Klindworth*, 556 F. App'x 497, 499 (7th Cir. 2014) (Generally,

24

1  "[p]risoners do not have a constitutional right to hot water under the Eighth Amendment."

2  (citation omitted)); *Adcock v. Burton*, No. 2:20-CV-0035 KJN P, 2020 WL 3073334, at *3 (E.D.

3  Cal. June 10, 2020) ("Generally, the short-term failure to provide hot water does not violate the

4  Eighth Amendment.").

5          Similarly, Plaintiff declares that he lacked shower access while in E-Unit. According to

6  Defendant Jackson, when E-Unit first opened, protocols precluded isolated prisoners from

7  receiving "the opportunity to shower for a specific amount of time to reduce the spread of []

8  COVID-19." Dkt. 41 ¶ 9. But Plaintiff does not meaningfully dispute Defendant Jackson's

9  assertion that prisoners received "washbasins and toiletry items to maintain personal hygiene."

10  *Id.* As noted, Plaintiff admits that he received a "bucket" of cold water for "wash[ing himself]."

11  Dkt. 47 ¶ 8. Furthermore, although Plaintiff declares that he did not receive "basic human

12  necessities to maintain [his] personal hygiene throughout [his] time in isolation," *id.* ¶ 11, this

13  statement is conclusory. Plaintiff does not explain what items Defendants failed to provide or

14  how he could not maintain personal hygiene. Additionally, Plaintiff admits that he was able to

15  shower once after about two weeks. *Id.* ¶ 8. This statement supports Defendant Jackson's

16  assertion that E-Unit's prisoners started receiving showers on March 28, 2020, after medical staff

17  informed him showering was safe. *See* Dkt. 41 ¶ 9. These facts do not support a reasonable

18  inference that the subject Defendants were disregarding Plaintiff's right to shower. *Cf.*

19  *McFarland v. Kullojka*, No. C18-457-JCC-JPD, 2019 WL 937237, at *5 (W.D. Wash. Jan. 30,

20  2019) (8-day deprivation of showers "w[as] not sufficiently serious to implicate Eighth

21  Amendment concerns"), *report and recommendation adopted*, 2019 WL 934948 (W.D. Wash.

22  Feb. 26, 2019); *Pamer v. Schwarzenegger*, No. CIV S-07-1902-MCE, 2010 WL 5418867, at *5

23  (E.D. Cal. Dec. 23, 2010) ("[A] one time denial of a shower for 15 days is insufficient [to violate

24

1  the Eighth Amendment].”), *report and recommendation adopted*, 2011 WL 1221198 (E.D. Cal.

2  Mar. 29, 2011).

3      It is undisputed that Plaintiff was not allowed to leave his cell for exercise. But it is also

4  undisputed that, after the pandemic started, Plaintiff told medical staff that he had abdominal

5  pain and that he was sent to E-Unit. *See* Dkt. 47 ¶¶ 3, 5. Likewise, Plaintiff does not

6  meaningfully dispute the assertions of Defendants Jackson and Russell that: (1) DOC officials

7  created E-Unit to house prisoners suspected or confirmed to have COVID-19 to isolate them

8  from the rest of the prison population by way of mitigating the spread of the virus; and (2)

9  medical staff determined which prisoners would be placed in E-Unit. *See* Dkt. 40 ¶¶ 11–12; Dkt.

10  41 ¶¶ 3, 6, 14. Therefore, a reasonable juror could only conclude that medical staff decided that

11  Plaintiff should be placed into E-Unit. Plaintiff disputes the propriety of this decision, stating that

12  he was not sick or tested for COVID-19 beforehand. Dkt. 47 ¶ 5. However, the subject

13  Defendants reasonably could have deferred to this medical determination. *See Spruill v. Gillis*,

14  372 F.3d 218, 236 (3d Cir. 2004) (“If a prisoner is under the care of medical experts . . . , a non-

15  medical prison official will generally be justified in believing that the prisoner is in capable

16  hands.”); *cf. Peralta v. Dillard*, 744 F.3d 1076, 1086–87 (9th Cir. 2014) (medical official with

17  “largely administrative” role in a prisoner’s medical care could rely on the medical opinions of

18  treating medical staff). And letting Plaintiff out of his cell for exercise, outdoor or indoor, would

19  have thwarted the very purpose of his isolation. *See* Dkt. 41 ¶ 11.

20      Furthermore, Defendant Jackson declares that, despite the restrictions on out-of-cell

21  recreation, “[a]ll efforts were made to provide [prisoners] with playing cards, reading material,

22  radios[,] and other items at no cost as they became available.” *Id.* Similarly, Defendant Fischer

23  declares that he provided Plaintiff with a copy of the Gospel of John. Dkt. 42 ¶ 5. Plaintiff has

24

1    not disputed these averments. Thus, the evidence shows that DOC officials sought to provide

2    Plaintiff with ways to exercise his mind despite his 17-day isolation.

3          In sum, the evidence shows that DOC medical staff decided to isolate Plaintiff to try to

4    control the spread of COVID-19 at MCC. It is also beyond dispute that "COVID-19 presented a

5    public health crisis unlike any that we have encountered in our time." *Fraihat v. U.S. Immigr. &*

6    *Customs Enf't*, 16 F.4th 613, 639 (9th Cir. 2021) (citation omitted). Additionally, the evidence

7    shows that DOC officials provided Plaintiff with means of exercising his mind while in isolation.

8    On these facts, no juror reasonable could conclude that the subject Defendants deliberately

9    disregarded Plaintiff's need for exercise. And, for the same essential reasons, a reasonable juror

10   could only conclude that the subject Defendants took reasonable efforts to remedy Plaintiff's

11   deprivation of indoor and outdoor physical exercise.

12         Plaintiff alleges that his cell had mold. Dkt. 47 ¶¶ 6–7. There is no evidence that the

13   subject Defendants made any efforts to remedy this alleged condition. However, plaintiff's

14   allegations regarding mold are quite general. *See id.* Plaintiff does not describe the appearance or

15   smell of the alleged mold or provide any other allegations explaining the factual basis for his

16   determination that the cell had mold. Furthermore, Plaintiff has not alleged that the purported

17   mold caused him any physical injury. Rather, he alleges that, "*[b]ecause of the cold and [his]*

18   *abdominal pain*, [Plaintiff] was hurting and physically suffering for 17 days." Dkt. 47 ¶ 9

19   (emphasis added). That is, Plaintiff attributes the physical pain he experienced in E-Unit to cold

20   temperatures and his preexisting abdominal pain. *See id.* In short, Plaintiff's allegations of mold

21   in his cell lack factual support and do not support a reasonable inference that the purported mold

22   caused Plaintiff any physical injury. Therefore, even if the subject Defendants knew about the

23   alleged mold, the evidence does not support a reasonable finding that they actually drew the

24

1    inference it posed a substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 837; *see*

2    *also Shrader v. White*, 761 F.2d 975, 984 (4th Cir. 1985) (allegations of mold in showers did not

3    violate Eighth Amendment, partly because there was "no evidence of disease resulting from

4    mold"); *Smith v. Roosevelt Cty. Jail*, No. CV 05-120 GFSEH, 2007 WL 30272, at *3 (D. Mont.

5    Jan. 3, 2007) (allegation of mold on bathroom ceiling did not "rise to the level necessary to

6    establish an Eighth Amendment violation" where the plaintiff did not allege that the mold

7    "injured him or caused other problems"); *cf. Thurmond v. Andrews*, 972 F.3d 1007, 1012–13 (8th

8    Cir. 2020) (noting a "death of . . . authority" nationally regarding a prisoner's right to be free

9    from mold).

10   Plaintiff also declares that he was forced to wear "old, smelly" clothes that "appeared to

11   have mold on them." Dkt. 47 ¶ 6. No reasonable juror could conclude that the alleged presence

12   of mold on Plaintiff's clothes violated the Eighth Amendment for the reasons in the previous

13   paragraph. Furthermore, the unadorned allegation that Plaintiff wore "old, smelly" clothes for 17

14   days does not, without more, support a reasonable finding that the subject Defendants

15   deliberately disregarded Plaintiff's rights to clothing and adequate hygiene. *See Cafasso*, 637

16   F.3d at 1061; *see also McGlothin v. Harrington*, No. 1:10CV00247 AWI, 2013 WL 5466629, at

17   *6 (E.D. Cal. Sept. 30, 2013) (citing case for proposition that "2 week stay" in cell with "no

18   clean clothes" did not violate the Eighth Amendment (citation omitted)).

19   Furthermore, Defendant Jackson stated in his response to Plaintiff's appeal that "clothing

20   exchange" "was delayed" during the early stages of E-Unit but that "[c]hanges were made to

21   address [this] issue[.]" *See* Dkt. 6-1 at 4. And Plaintiff does not dispute Defendant Jackson's

22   assertion that he was "among the first occupants of" E-Unit. *Id.* Therefore, even if Plaintiff did

23   not receive a change of clothes during his entire stay in E-Unit, the evidence does not support a

24

1   reasonable finding that the subject Defendants deliberately disregarded the prisoners' need for

2   clean clothes, much less that they actually inferred that the delays in clothing exchange posed a

3   substantial risk of serious harm to Plaintiff. That Plaintiff has not alleged any physical injury or

4   pain resulting from his use of "old, smelly" clothes supports this conclusion.

5          Lastly, Plaintiff states that being housed with prisoners who had tested positive for

6   COVID-19 caused him anxiety which, in turn, caused sleep deprivation and "severe discomfort."

7   Dkt. 47 ¶¶ 5, 13. This allegation is conclusory. Plaintiff had his own cell in E-Unit and could not,

8   with a minor exception, leave it.[8] This fact impels the inference that, consistent with guidelines

9   of the Center for Disease Control and Prevention, Plaintiff was physically distanced from

10  prisoners and staff by "at least 6 feet." *See* https://www.cdc.gov/coronavirus/2019-

11  ncov/community/correction-detention/guidance-correctional-detention.html;[9] *cf.* Dkt. 40 ¶ 9

12  ("[D]roplet precaution procedures are put in place, ensuring that staff wears appropriate personal

13  protective equipment when within 6 feet of the isolation cell."). Plaintiff has not provided any

14  additional allegations supporting a reasonable inference that placement in E-Unit increased his

15  exposure to COVID-19 or the likelihood that he would contract it. *See Nelson*, 83 F.3d at 1081–

16  82 ("[M]ere . . . speculation do[es] not create a factual dispute for purposes of summary

17  judgment."). Nor has Plaintiff described any physical symptoms that would have given the

18  subject Defendants reason to believe that housing him with COVID-19-positive prisoners in E-

19  Unit posed a substantial risk of serious harm to his health. Rather, as noted, Plaintiff simply

20

21  _____

22          [8] Plaintiff presumably left his cell when he showered. However, there is no evidence that
    he was with other prisoners who had tested positive for COVID-19 or that this event increased
23  his exposure to same.
            [9] *See Gabertan v. Walmart, Inc.*, 523 F. Supp. 3d 1254, 1258 n.4 (W.D. Wash. 2021)
24  (taking judicial notice of the CDC's COVID-19 guidelines).

REPORT AND RECOMMENDATION - 26

alleges that the anxiety of being housed with prisoners who had tested positive for the virus

caused him "loss of sleep and severe discomfort." Dkt. 47 ¶ 13. In short, no evidence supports a

reasonable finding that housing prisoners suspected of having COVID-19 in the same unit as

those confirmed to have it posed a substantial risk of serious harm to the prisoners only

suspected of having the virus. Thus, there is no reasonable basis on which to infer that the

decision of Defendants Jackson and Russell—in conjunction with other DOC officials—to open

E-Unit and house prisoners requiring isolation or quarantine was an unreasonable method to

mitigate the spread of the virus in MCC. Likewise, no evidence supports a reasonable inference

that the subject Defendants actually inferred that this housing assignment substantially exposed

Plaintiff to the risk of contracting COVID-19.

In sum, no reasonable juror could conclude that the subject Defendants disregarded the

conditions in Plaintiff's cell. Furthermore, a reasonable juror could only conclude that these

Defendants reasonably responded to those conditions. Accordingly, summary judgment should

be granted to Defendants on Plaintiff's Eighth Amendment claim against Defendants Jackson,

Frantz, and HQ Incident Commander.[10]

---

[10] Plaintiff declares that "DOC staff did not provide him with any medical treatment for [his] pain" while he was in E-Unit. Dkt. 47 ¶ 11. However, there is no evidence that any Defendant was aware of Plaintiff's pain. Although a reasonable juror could conclude that the subject Defendants were aware of E-Unit's conditions, absent more, it does not follow that they would have known about Plaintiff's pain. Furthermore, there is no evidence that any Defendant was "responsible for" Plaintiff's medical care, either before or during his stay in E-Unit. *See McGuckin*, 974 F.2d at 1062; *see also* Dkt. 40 ¶ 12; Dkt. 41 ¶ 14; Dkt. 47 ¶¶ 3–5. Accordingly, no reasonable juror could conclude that Defendants were deliberately indifferent to this medical need.

1       ## V.      Due Process

2              Plaintiff alleges that E-Unit's conditions amounted to "Punitive Isolation" that violated

3       due process. Dkt. 6 at 12–14. However, as the analysis of his Eighth Amendment claim shows,

4       no evidence supports a reasonable finding that DOC officials isolated Plaintiff to punish him.

5       Rather, the evidence compels the conclusion that medical staff placed Plaintiff in E-Unit based

6       on a suspicion that he could have COVID-19 following his complains of abdominal pain. *See,*

7       *e.g.*, Dkt. 41 ¶ 14; Dkt. 47 ¶¶ 3–5. And, despite the adverse conditions in E-Unit, there is no

8       evidence that DOC officials opened E-Unit to punish prisoners. Rather, the uncontradicted

9       evidence is that E-Unit was for medical isolation and quarantine. *See, e.g.*, Dkt. 40 ¶¶ 11–12;

10      Dkt. 41 ¶ 6. Therefore, when analyzing Plaintiff's due process claim, the Court considers his

11      segregation as administrative, not punitive or disciplinary. *See Hewitt v. Helms*, 459 U.S. 460,

12      468 (1983) ("administration segregation" is a "catchall" phrase that includes segregation to

13      "protect the prisoner's safety" or "protect other inmates from a particular prisoner" but is

14      "nonpunitive"), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 480–84

15      (1995).

16             "It is well-established that[] [t]he requirements of procedural due process apply only to

17      the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty

18      and property." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (citation and internal

19      quotation marks omitted). Under *Sandin*, "a prisoner possesses a liberty interest under the federal

20      constitution when a change occurs in confinement that imposes an atypical and significant

21      hardship in relation to the ordinary incidents of prison life." *Id.* (alteration adopted) (citation and

22      internal quotation marks omitted).

23

24

REPORT AND RECOMMENDATION - 28

1    "There is no single standard for determining whether a prison hardship is atypical and

2    significant, and the condition or combination of conditions or factors requires case by case, fact

3    by fact consideration." *Ramirez*, 334 F.3d at 861 (alteration adopted) (citation and internal

4    quotation marks omitted). Courts may consider: (1) the duration of the confinement; (2) whether

5    the conditions of the confinement were significantly harsher than those of prisoners in the

6    general population or confined prisoners; (3) whether the confinement will invariably affect the

7    duration of the prisoner's sentence; and (4) whether the prisoner is confined for emergency

8    reasons. *See Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 987 (9th Cir. 2014); *Richardson v.*

9    *Runnels*, 594 F.3d 666, 672–73 (9th Cir. 2010); *Ramirez*, 334 F.3d at 861; *Jackson*, 353 F.3d at

10   755; *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000); *Hayward v. Procunier*, 629 F.2d 599,

11   601–03 (9th Cir. 1980). "If a protected liberty interest is at stake, then the court must determine

12   whether the procedures used to deprive the prisoner of that liberty violate due process." *Brown*,

13   751 F.3d at 987 (citation omitted).

14        Here, no reasonable juror could conclude that Plaintiff's administrative confinement

15   created a liberty interest. Regarding the first factor, the duration of Plaintiff's stay in E-Unit, 17

16   days, weights heavily against the creation of a liberty interest. *See Richardson*, 594 F.3d at 672–

17   673 (15-day administration segregation "did not constitute atypical and significant hardship in

18   relation to the ordinary incidents of prison life" (citations omitted)). Regarding the second factor,

19   the Court recognizes that the conditions in E-Unit were unpleasant. However, Plaintiff has not

20   provided any evidence of the conditions that other prisoners in other units or areas of MCC

21   routinely faced. Plaintiff only alleges that he was not "permitted time outside of [his] cell, as

22   inmates in solitary confinement are normally allowed to have." Dkt. 47 ¶ 3. Absent more, this

23   unadorned allegation does not support a reasonable inference that "the State's actions in placing

24

him there for [17] days . . . work[ed] a major disruption in his environment." *See Sandin*, 515

U.S. at 486. The third factor strongly disfavors Plaintiff because he does not allege that his 17-

day stay in E-Unit will invariably affect the duration of his sentence.

Regarding the fourth factor, the record supports a reasonable finding that Plaintiff was

housed in E-Unit for emergency reasons. As stated, "COVID-19 presented a public health crisis

unlike any that we have encountered in our time." *Fraihat*, 16 F.4th at 639. Furthermore, as

discussed above, the evidence compels the conclusion that DOC officials opened E-Unit to try to

mitigate the spread of the virus. True, Plaintiff disputes that he should have been placed in E-

Unit because he "was not sick . . . [or] . . . having any . . . respiratory symptoms . . . associated

with Covid-19" and was not "tested . . . for Covid" before being placed in E-Unit. *See* Dkt. 47 ¶

5. However, even if there was no valid medical basis to place Plaintiff in E-Unit, DOC officials

nevertheless had a good reason to open E-Unit. And, again, Defendants could have reasonably

deferred to medical staff's decision to place Plaintiff in E-Unit. Consequently, the fourth factor

disfavors Plaintiff.

In sum, no reasonable juror could conclude that Plaintiff's administrative confinement

created a liberty interest. Accordingly, summary judgment should be granted to Defendants on

his due process claim.

**VI.    Equal Protection**

Plaintiff alleges that E-Unit's conditions violated equal protection because they were

"substantially harsher than other similar[ly] situated Medical isolations." Dkt. 6 at 15.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State

shall deny to any person within its jurisdiction the equal protection of the laws, which is

essentially a direction that all persons similarly situated should be treated alike." *City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation and internal quotation marks omitted). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted).

Furthermore, "[w]here . . . state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that it 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Here, Plaintiff has not provided any evidence that he is a member of a protected class. Furthermore, there is no evidence that any Defendant discriminated against him based on membership in a protected class. Nor is there any evidence that any Defendant intentionally treated Plaintiff differently than similarly situated persons and that there was no rational basis for the difference in treatment. The only conceivably relevant evidence is Plaintiff's sworn statement that he was not allowed outside his cell like "inmates in solitary confinement are normally allowed to have." Dkt. 47 ¶ 10. However, Plaintiff provides no evidence that inmates in solitary confinement are similarly situated to Plaintiff. Moreover, no evidence supports Plaintiff's unsworn, conclusory allegation that the conditions in E-Unit were "substantially harsher than other similar[ly] situated Medical isolations." Dkt. 6 at 15. Thus, no reasonable juror could conclude that Plaintiff's stay in E-Unit violated equal protection. Consequently, summary judgment should be granted to Defendants on Plaintiff's equal protection claim.

### VII.    Free Exercise of Religion

Plaintiff alleges that his right to religious freedom was violated because "Bibles and other religious items [were not allowed] into 'E-unit.'" Dkt. 6 at 16.

"Inmates retain the protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *Shakur v. Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008) (citation and internal quotation marks omitted). "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 884.

Here, Plaintiff only challenges Defendant Fischer's decision to deny him a bible while he was in E-Unit. *See* Dkt. 6 at 16. Contrary to Plaintiff's allegation, *see id.*, Plaintiff does not declare that Defendants denied him "other religious items" while in E-Unit. *See* Dkt. 47.

Here, Defendant Fischer declares that paper given to prisoners in E-Unit would have to be destroyed to prevent spreading the virus to others. Dkt. 42 ¶ 3. Defendant Fischer further declares that, although Plaintiff asked for a bible, he would have had to destroy it when Plaintiff left isolation. *Id.* ¶ 5. Additionally, Defendant Fischer declares that he did not believe that "destroying a bible after a few weeks of use would be a wise stewardship of donated bibles." *Id.* ¶ 4. Instead, Defendant Fischer provided Plaintiff with a copy of the Gospel of John. *Id.* ¶ 5; Dkt. 42-2 at 39. Plaintiff does not dispute these averments. *See* Dkt. 45 at 6; Dkt. 47.

On this record, a reasonable juror could only conclude that Defendant Fischer's actions were reasonably related to legitimate penological interests. Indisputably, MCC had legitimate interests in preserving its donated bibles (e.g., providing prisoners with religious materials, conserving resources, and encouraging donations). The "valid, rational connection" between these interests and his decision to preserve the bibles is manifest. *See Shakur*, 514 F.3d at 884

1    (citation and internal quotation marks omitted). Furthermore, Plaintiff had an "alternative means

2    of exercising [his religious] right[s]" because Defendant Fischer gave him a copy of the Gospel

3    of John. *See id.* (citation and internal quotation marks omitted). Plaintiff has not stated otherwise.

4           Furthermore, Defendant Fischer's uncontradicted statements impel the inference that

5    accommodating Plaintiff's wish for a bible would have "impact[ed] . . . the allocation of prison

6    resources generally." *See id.* (citation and internal quotation marks omitted). Again, had

7    Defendant Fischer given Plaintiff a bible, he would have had to destroy it. This would have

8    reduced the prison's supply of bibles and/or required DOC officials to obtain new bibles.

9    Moreover, the record reflects an "absence of ready alternatives versus the existence of obvious,

10   easy alternatives." *See id.* (citation and internal quotation marks omitted).

11          In sum, the evidence shows that Defendant Fischer's decision to give Plaintiff a copy of

12   the Gospel of John versus a bible while he was in E-Unit was reasonably related to legitimate

13   penological interests. Accordingly, summary judgment should be granted to Defendants on

14   Plaintiff's free exercise claim.

15   **VIII.   Retaliation**

16          Plaintiff alleges that, after he tried to expose E-Unit's conditions, he experienced

17   retaliation because his grievances were "thrown away and or not properly processed" and he

18   received a negative BOE. Dkt. 6 at 18. However, there is no evidence that Plaintiff received a

19   negative BOE. *See* Dkt. 6-1 at 2, 4, 6; Dkt. 47.

20          Plaintiff does declare that "DOC employees and staff" "thr[ew] away or lost" his

21   grievances. Dkt. 47 ¶ 12. Likewise, in his emergency grievance, Plaintiff stated that a "guard

22   denied taking [his] grievances." Dkt. 6-1 at 2. Similarly, in his appeal, Plaintiff complains about

23

24

"disappearing grievances [he] wrote" while in E-Unit without attributing this conduct to any individual. *Id.* at 6.

In short, Plaintiff does not identify which DOC official(s) participated in the refusal to accept or the disappearance of his grievances. Furthermore, no evidence supports a reasonable inference that any named Defendant was personally or causally involved in this conduct.

The mere fact that Defendants Wood and Jackson were involved in responding to Plaintiff's appeal does not, without more, support a reasonable inference that they destroyed any grievance. *See* Dkt. 6-1 at 4. Notably, in his emergency grievance and appeal, Plaintiff contends that his grievances disappeared when he was in or, at best, immediately after he left E-Unit on April 2, 2020. *See id.* at 2, 6. There is no evidence that any Defendant knew about Plaintiff's grievances during this period. It is unclear whether Plaintiff alleges that he filed additional grievances after that time. *See* Dkt. 47 ¶ 12 ("On April 2, 2020, I was released from isolation . . . . I filed multiple grievances regarding my experiences in the PIU and each grievance was either thrown away or lost by DOC employees and staff."). Absent more, this unadorned, equivocal allegation does not support a reasonable inference that Defendants Wood and Jackson participated in the destruction of any grievance purportedly filed when they were investigating and responding to Plaintiff's emergency grievance and appeal.

Plaintiff also alleges that his grievances were not properly processed. But, as noted, prisoners have no due process right to a "specific prison grievance procedure." *Ramirez*, 334 F.3d at 860. Moreover, it is unclear what Plaintiff's allegation that his grievances were not "properly processed" means. Dkt. 6 at 18. If Plaintiff means that DOC officials refused to accept or caused the disappearance of his grievances, the Court has already explained how these allegations fail to create a genuine factual dispute. If Plaintiff means something else, Plaintiff did

not flesh out this vague allegation with any evidence. So it still fails to create a genuine factual dispute. *See, e.g.*, *Taylor*, 880 F.2d at 1045.

Accordingly, no reasonable juror could conclude that Defendants retaliated against Plaintiff. Summary judgment should be granted to Defendants on this claim.

**IX.     Right to Access the Courts**

Plaintiff alleges a violation of his right to access the courts. Dkt. 6 at 17. In support, Plaintiff alleges that he could not access the court "without . . . first being able to exhaust the grievance process/remedy." *Id.*

To establish a right-of-access claim, the prisoner "must show . . . actual injury—that is, actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Lewis v. Casey*, 518 U.S. 343, 348 (1996) (citation and internal quotation marks omitted). The frustrated or impeded claim must be a nonfrivolous direct criminal appeal, habeas petition, or civil rights action. *See id.* at 353–54 & n.3.

Here, Plaintiff's own evidence shows that he exhausted administrative remedies regarding the claims at issue. Dkt. 6-1 at 2, 4, 6. Furthermore, Plaintiff does not allege that any Defendant frustrated or impeded any other claims. So no reasonable juror could conclude that Defendants violated his right to access the court. Accordingly, summary judgment should be granted to Defendants on Plaintiff's right-of-access claim.

**X.     RLUIPA**

Plaintiff alleges a violation of RLUIPA. Dkt. 6 at 20. Defendants are entitled to judgment on this claim as a matter of law. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("RLUIPA does not authorize suits for damages against state officials in their individual capacities . . . ." (citation omitted)).

1    **XI.    State-Law Claim**

2           Plaintiff alleges a violation of Article 1, § 22 of the Washington State Constitution based

3    on the allegations underlying his free exercise claim. *See* Dkt. 6 at 21. Because this claim has a

4    "common nucleus of operative fact with the federal claims and the state and federal claims

5    would normally be tried together," the Court has supplemental jurisdiction over the state-law

6    claim. *See Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (citation and internal

7    quotation marks omitted).

8           However, the Court should decline to exercise supplemental jurisdiction over this claim.

9    *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal

10   claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state

11   claims should be dismissed as well."); *Trustees of Constr. Indus. & Laborers Health & Welfare*

12   *Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) ("[O]ur cases

13   upholding the exercise of discretion under [28 U.S.C.] § 1367(c)(3) have all involved dismissals

14   for failure to state a claim or a grant of summary judgment to the defendant on the federal

15   claim." (citations omitted)). The Court has dismissed all of Plaintiff's § 1983 claims and

16   recognizes the policy of avoiding "[n]eedless decisions of state law." *See Gibbs*, 383 U.S. at 726.

17   Likewise, counsel for Plaintiff represents that he has "filed a tort claim on [Plaintiff's] behalf."

18   Dkt. 46 ¶ 2. Because Plaintiff's state-law claim may relate to his tort claim, the Court should

19   extend "comity" to the Washington courts and avoid issuing a decision that could potentially

20   interfere with the state courts' consideration of Plaintiff's tort claim. *See Carnegie-Mellon Univ.*

21   *v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

22

23

24

1

**REMAINING MATTER**

2        In his response to Defendants' motion for summary judgment, Plaintiff, through counsel,

3    asks for a 90-day continuance pursuant to Fed. R. Civ. P. 56(d). Dkt. 45 at 1, 6–7. Alternatively,

4    counsel asks the Court to dismiss this case without prejudice. *Id.* at 1, 7.

5        One of the bases for counsel's request for a continuance is so counsel can pursue "his

6    recently filed tort claim." *Id.* at 1. However, counsel declares that he already filed the tort claim

7    and it is unclear how granting a continuance or dismissing the case without prejudice would

8    further that objective. So this argument is unpersuasive.

9        Counsel also seeks a continuance or dismissal without prejudice so that Plaintiff can

10   "pursue his damage claim against the correct responsible parties" and "bring proper claims

11   before this Court." *Id.* 1, 4. In support, counsel states that he believes Plaintiff "has Eighth

12   Amendment claims against the officials that ordered that he be placed in the isolation unit . . .

13   and the reason for that placement and the persons involved in it were never explored by

14   plaintiff." Dkt. 46 ¶ 5. However, Rule 56(d) provides that the Court may defer considering a

15   motion for summary when the Plaintiff "cannot present facts essential to justify its opposition."

16   Here, Plaintiff seeks a continuance to develop new claims and add new defendants, which is an

17   improper use of Rule 56(d). And the Court will not construe this request as a motion to amend

18   because Plaintiff did not file a separate motion to amend containing "a copy of the proposed

19   amended pleading." LCR 15.

20       Likewise, the Court will not construe counsel's request for dismissal without prejudice as

21   a motion or request for voluntary dismissal under Fed. R. Civ. P. 41(a)(2). The request is

22   conclusory. *See* Dkt. 45 at 1, 7; Dkt. 46 ¶ 7. Apart from the reasons counsel provides to support

23   his request for a continuance, none of which is persuasive, counsel does not clearly state a basis

24

1    for dismissal without prejudice. Furthermore, counsel did not cite Rule 41 or characterize his

2    conclusory request for dismissal without prejudice as a motion or request for voluntary dismissal.

3           Additionally, even if it were proper to treat counsel's conclusory request for dismissal

4    without prejudice as a motion or request for voluntary dismissal under Rule 41(a)(2), granting it

5    would be improper. Defendants would suffer "some plain legal prejudice as a result of the

6    dismissal." *See Westlands Water Dist. v. United States*, 100 F.3d 94, 96 (9th Cir. 1996) (citations

7    omitted). In the Rule 41(a)(2) context, plain legal prejudice includes undue delay. *See Cent.*

8    *Montana Rail v. BNSF Ry. Co.*, 422 F. App'x 636, 638 (9th Cir. 2011) (citing *Westlands*, 100

9    F.3d at 97). Counsel has not explained why Plaintiff waited until after defendants filed a motion

10   for summary judgment to request dismissal without prejudice. *See id.* (affirming district court's

11   denial of Rule 41(a)(2) motion where the plaintiff gave "no explanation for why it delayed so

12   long in requesting voluntary dismissal"). Also, Plaintiff did not seek dismissal without prejudice

13   until faced with a meritorious motion for summary judgment, which further weighs against the

14   propriety of dismissal without prejudice. *See Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354,

15   358 (10th Cir. 1996) ("We agree with the district court that a party should not be permitted to

16   avoid an adverse decision on a dispositive motion by dismissing a claim without prejudice."

17   (citation omitted)); *cf. Terrovona v. Kincheloe*, 852 F.2d 424, 426, 428–29 (9th Cir. 1988)

18   (district court did not abuse discretion in denying Rule 41(a)(2) motion when the plaintiff filed it

19   in response to a magistrate judge's report and recommendation finding his petition meritless).

20          Moreover, counsel represents that Plaintiff has "limited access" to him due to a recent

21   COVID-19 lockdown. Dkt. 46 at 6. Therefore, Plaintiff "is unable to properly respond" to

22   Defendants' motion for summary judgment "without a continuance." *Id.* The record contradicts

23   counsel's contention. Plaintiff filed a declaration in opposition to the motion for summary

24

1    judgment, Dkt. 47, and the declaration is largely consistent with the complaint's allegations.

2    Furthermore, Plaintiff submitted grievances relevant to his claims. Dkt. 6-1 at 2, 4, 6. Notably,

3    counsel has not identified what essential evidence a continuance would allow Plaintiff to develop

4    or explained why Plaintiff could not have developed this putative evidence sooner. Therefore,

5    this argument is unavailing. Similarly, any contention by counsel that he has not had enough

6    "time to prepare . . . does not justify a voluntary dismissal." *See Kern Oil & Ref. Co. v. Tenneco*

7    *Oil Co.*, 792 F.2d 1380, 1390 (9th Cir. 1986)

8         In sum, Plaintiff's request for a 90-day continuance or, in the alternative, dismissal

9    without prejudice should be denied.

10              *IN FORMA PAUPERIS* **("IFP") STATUS ON APPEAL**

11        Plaintiff should be granted IFP status for purposes of an appeal of this matter as described

12    below. IFP status on appeal shall not be granted if the district court certifies "before or after the

13    notice of appeal is filed" "that the appeal is not taken in good faith[.]" *See* Fed. R. App. P.

14    24(a)(3)(A). "The good faith requirement is satisfied if the petitioner seeks review of any issue

15    that is not frivolous." *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977) (citation and internal

16    quotation marks omitted). Generally, an issue is not frivolous if it has an "arguable basis either in

17    law or in facts." *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

18        Here, Plaintiff's Eighth Amendment claim is not frivolous. Therefore, IFP status should

19    be granted for purposes of an appeal of this claim only.

20                          **CONCLUSION**

21        As discussed above, it is recommended that Defendants' motion for summary judgment

22    (Dkt. 39) be **GRANTED**, with the result that the Court should **grant summary judgment** for

23

24

REPORT AND RECOMMENDATION - 39

1    Defendants on Plaintiff's federal claims and **dismiss without prejudice** Plaintiff's state-law

2    claim.

3         Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the Parties shall have

4    fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

5    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

6    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

7    of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985);

8    *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating

9    the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

10   **March 11, 2022** as noted in the caption.

11        Dated this 23rd day of February, 2022.

12

13                                   _____

14                                   David W. Christel
                                     United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24